IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Thomas Pelzer, | ) | Case No. 8:10-cv-1603-MBS-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| v. | ) | |
| | ) | |
| Michael McCall, Jr.; Captain Florence | ) | |
| Mauney; N. Andrew Cooper; Ms. Blatton,[1] | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on Plaintiff's motion for partial summary judgment and Defendants' cross-motion for summary judgment. Plaintiff is proceeding pro se and brought this civil rights action under 42 U.S.C. § 1983. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983, and submit findings and recommendations to the District Court.

Plaintiff filed this action on June 23, 2010, generally alleging violations of his First, Eighth, and Fourteenth Amendment rights. [Doc. 1.] On February 4, 2011, Plaintiff filed a motion for partial summary judgment and notice of trial request, seeking summary judgment as to Defendants Michael McCall, Jr. ("McCall"), Florence Mauney ("Mauney"), and N. Andrew Cooper ("Cooper") on Plaintiff's First Amendment claims. [Doc. 52]

---

[1] Defendant Bratton is incorrectly identified in the caption of the complaint as Defendant Ms. Blatton. The Court will use the correct name, Bratton, to refer to this defendant.

Defendants filed a response on March 2, 2011.  [Doc. 65]  Plaintiff filed a reply on March 11, 2011.  [Doc. 70.]

On April 4, 2011, Defendants filed a motion for summary judgment.[2]  [Doc. 74.] Plaintiff filed a response to Defendants' motion for summary judgment on May 11, 2011. [Doc. 85.]  Plaintiff's and Defendants' motions are now ripe for review.

## BACKGROUND

Plaintiff, at all times relevant to this action, was in the custody of the South Carolina Department of Corrections ("SCDC") and housed at Perry Correctional Institution ("PCI") in the Special Management Unit ("SMU").[3]  [Doc. 1 ¶¶ 10–11.[4]]  Plaintiff alleges McCall, the warden of PCI, prohibited SMU prisoners from receiving newspapers, magazines, and radios such that SMU prisoners have no access to these materials, which violated Plaintiff's First Amendment rights.  [*Id.* ¶ 12.]  Plaintiff further alleges that, as a purported substitute, Cooper, PCI's chaplain, was responsible for providing weekly newsletters to SMU prisoners.  [*Id.* ¶ 15.]  Plaintiff contends Cooper provided only seven newsletters during a period of forty-six weeks, and Captain Miller, the captain over the SMU, provided seven newsletters entitled "Perry SMU Information and Awareness."  [*Id.* ¶ 16.]  Plaintiff alleges that the newsletter provided by Cooper was mostly devoted to Christian topics.  [*Id.* ¶ 17.]  Plaintiff alleges that he is a member of the Sixteen Blacks Nationalist Party, one part

---

[2] On April 21, 2011, the Court granted Defendants' motion to stay further discovery pending the resolution of Plaintiff's motion for partial summary judgment and Defendants' cross-motion for summary judgment.  [Doc. 83.]

[3] Plaintiff remains in the custody of SCDC and housed at PCI.  [*See* Doc. 87.]

[4] With respect to Plaintiff's documents, the paragraph numbers referenced by the Court are the paragraphs numbered by Plaintiff—i.e., the paragraph numbers that are handwritten on pages 3–12.

of which is the religious order that adheres to Islam, with some variances, and one of the steadfast practices is political awareness and involvement.  [*Id.* ¶ 10.]  Plaintiff further alleges the newsletters provided by Cooper violated the Establishment Clause of the First Amendment because the main purpose of the newsletters was to advance Christianity, and the newsletters made Plaintiff a forced participant in the "Perry Christian Community" because the newsletters were Plaintiff's only access to news.  [*Id.* ¶ 35.]

Moreover, Plaintiff alleges SMU prisoners, who are locked in their cells for twenty-three hours a day and, therefore, have no access to the library or education building, are only sent fiction or biographies from the library.  [*Id.* ¶ 13.]  Plaintiff contends SMU prisoners cannot receive any rehabilitative or educational material, and the only religious material SMU prisoners can receive is the Bible, which the chaplain provides.  [*Id.*] Plaintiff alleges this deprivation of access to educational materials, as well as newspapers, magazines, and radios, violated his First Amendment rights, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth Amendment rights.  [*Id.* ¶¶ 34, 36–37.]  Plaintiff also alleges Defendants were grossly negligent by denying SMU prisoners access to these materials.  [*Id.* ¶ 38.]

Plaintiff seeks a declaration that Defendants' acts violated Plaintiff's rights; a permanent injunction ordering McCall to allow SMU prisoners to receive magazines, newspapers, and/or radios; damages; Plaintiff's costs; and any additional relief the Court deems just, proper, and equitable.  [*Id.* ¶¶ 42–47, 49.]

## APPLICABLE LAW

**Liberal Construction of Pro Se Complaint**

Plaintiff brought this action pro se, which requires the Court to liberally construe his pleadings. *Estelle v. Gamble*, 429 U.S.97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). Pro se pleadings are held to a less stringent standard than those drafted by attorneys. *Haines*, 404 U.S. at 520. Even under this less stringent standard, however, the pro se complaint is still subject to summary dismissal. *Id.* at 520–21. The mandated liberal construction means only that if the court can reasonably read the pleadings to state a valid claim on which the petitioner could prevail, it should do so. *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). A court may not construct the plaintiff's legal arguments for him. *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

**Requirements for a Cause of Action Under § 1983**

Section 1983 provides a private cause of action for plaintiffs alleging constitutional violations by persons acting under color of state law. Section 1983 provides, in relevant part,

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

4

42 U.S.C. § 1983.  To establish a claim under § 1983, a plaintiff must prove two elements: (1) that the defendant "deprived [him] of a right secured by the Constitution and laws of the United States" and (2) that the defendant "deprived [him] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage."  *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (citation and internal quotation marks omitted).

The under-color-of-state-law element, which is equivalent to the "state action" requirement under the Fourteenth Amendment,

> reflects judicial recognition of the fact that most rights secured by the Constitution are protected only against infringement by governments.  This fundamental limitation on the scope of constitutional guarantees preserves an area of individual freedom by limiting the reach of federal law and avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.

*Id.* at 310 (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998)) (internal citations and quotation marks omitted).  Nevertheless, "the deed of an ostensibly private organization or individual" may at times be treated "as if a State has caused it to be performed."  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  Specifically, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'"  *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).  State action requires both an alleged constitutional deprivation "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and that "the party charged with the deprivation must be a person who may

fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). A determination of whether a private party's allegedly unconstitutional conduct is fairly attributable to the State requires the court to "begin[ ] by identifying 'the specific conduct of which the plaintiff complains.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (quoting *Blum* v. *Yaretsky*, 457 U.S. 991, 1004 (1982)).

**Summary Judgment Standard**

Rule 56 states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this

6

standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

**First Amendment Claim Regarding Deprivation of Radios, Newspapers, and Magazines**

Plaintiff alleges Defendants deprived Plaintiff of radios, newspapers, and magazines in violation of the First Amendment.  The Court disagrees.

While prisoners do not forfeit all constitutional rights upon their imprisonment, *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), incarceration necessarily limits a prisoners' privileges and rights, which "arises both from the fact of incarceration and from valid penological objectives-including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948); citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Procunier v. Martinez*, 416 U.S. 396, 412 (1974)).  The Supreme Court has repeatedly upheld prison regulations restricting prisoners' First Amendment rights.  *See, e.g.*, *Beard v. Banks*, 548 U.S. 521 (2006); *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Turner v. Safley*, 482 U.S. 78 (1987); *Bell*, 441 U.S. 520.  In *Turner*, the Court explained that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  482 U.S. at 89.  The Supreme Court articulated four factors to determine if a prison regulation is reasonable: (1) whether there is a valid, rational connection between the regulation and "the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) how accommodating the asserted constitutional right will impact guards and other prisoners; and (4) whether there are ready alternatives to the regulation.  *Id.* at 89–91 (citation omitted).  The Supreme

Court has also advised that when determining whether a prison regulation is reasonable, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

### Connection Between Regulation and Governmental Interest

Plaintiff contends Defendants cannot prevail on their cross-motion for summary judgment because they have not produced evidence of the security issues that led to SMU prisoners' restricted possession of radios, batteries, newspapers, and magazines. [Doc. 85-1 at 3; *see also* Doc. 52 ¶ 6.] McCall averred SMU prisoners were using batteries from radios to construct handcuff keys, therefore, SMU prisoners' possession of radios and batteries was restricted. [Doc. 65-3 ¶ 2.] Also, McCall averred SMU prisoners were using magazines and newspapers to cover the openings of their cell doors and their cell lights; these practices were not limited to a few prisoners and were creating serious security issues. [*Id.*] As a direct result of this activity, McCall restricted SMU prisoners' possession of magazines and newspapers. [*Id.*] McCall further explained SMU prisoners were not restricted from possessing books but only those materials that were being used to create security issues—newspapers and magazines. [*Id.* ¶ 4.]

Contrary to Plaintiff's assertion, Defendants need not produce actual evidence to show a connection between the regulation and the governmental interest put forth to justify the regulation. *See, e.g.*, *Veney v. Wyche*, 293 F.3d 726, 732–34 (4th Cir. 2002) (stating that prison officials may reasonably conclude proactive measures should be taken).

9

Defendants must demonstrate only that (1) the connection between the regulation and the governmental interest is valid and rational and (2) the governmental interest is legitimate. *Turner*, 482 U.S. at 89 (quoting *Block*, 468 U.S. at 586). To meet these requirements, the connection cannot be "so remote as to render the policy arbitrary or irrational," and the governmental interest must be neutral, that is, without regard to the content of the expression. *Id.* at 89–90.

Here, Defendants have demonstrated a valid, rational connection between the PCI policy of limiting SMU prisoners' possession of radios, batteries, newspapers, and magazines and the legitimate governmental interest in preventing prison security issues. First, the Court recognizes that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547 (citing *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 128 (1977); *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974); *Cruz v. Beto*, 405 U.S. 319, 321 (1972)). Second, a prison regulation that limits prisoners' possession of materials that prisoners have used to create security hazards is clearly one way to minimize future security hazards and, therefore, is rationally related to a legitimate goal. Consequently, the Court finds that restricting SMU prisoners' possession of certain materials does not violate the prisoners' constitutional rights because "responsible, experienced administrators have determined, in their sound discretion, that such [materials] will jeopardize the security of the facility." *Block*, 468 U.S. at 589.

10

### *Alternative Means of Exercising First Amendment Rights*

In his affidavit submitted with Defendants' motion for summary judgment, McCall stated that he has attempted to provide alternatives to the information that could be derived from radios, magazines, and newspapers. [Doc. 65-3 ¶ 6.] McCall averred that he discussed a newsletter with Cooper and, as a result, a newsletter has been prepared and distributed to SMU prisoners by the chaplain's office. [*Id.* ¶ 7.] The newsletter from the chaplain's office is prepared by inmates, supervised by Cooper, and intended to be a weekly newsletter.[5] [*Id.*] McCall stated that he also had discussions with Miriam Snyder ("Snyder"), the inmate grievance coordinator, and as a result, the institution provided another source of news and current events entitled "Perry SMU Information & Awareness," which has been distributed to SMU prisoners twice a month since February 2010. [*Id.* ¶ 8.]

### *Impact of Accommodation on Guards and Prisoners*

McCall stated that failing to restrict these items would unduly burden very limited resources and personnel by requiring correctional officers and supervisors to address these security issues. [Doc. 65-3 ¶ 5.] For example, officers and supervisors would be

---

[5] Plaintiff contends Cooper provided only seven newsletters during a period of forty-six weeks, and Plaintiff received seven "Perry SMU Information & Awareness" newsletters. [Doc. 1 ¶ 16.] Cooper averred that while his office attempts to provide its newsletter on a weekly basis, it is not always able to do so because it relies on outside donations of paper and inmate time to prepare the newsletter. [Doc. 65-2 ¶ 5.] Cooper further averred that the inmate who delivers the newsletter is not always allowed in SMU to deliver the newsletter because of security issues and lack of officer manpower. [*Id.* ¶ 9.] Snyder averred that the first issue of "Perry SMU Information & Awareness" was prepared and distributed in February 2010 and, since that time, the newsletter was distributed twice a month except for July, August, and December 2010, when only one issue was distributed during the month. [Doc. 65-5 ¶ 4.] The Court finds that Defendants' inability to provide newsletters on a consistent basis does not detract from Defendants' attempt to provide an alternative means for Plaintiff to exercise his First Amendment rights. As explained below, courts have upheld similar restrictions on the receipt of newspapers even when prison officials did not provide an alternative news source. *See Beard*, 548 U.S. at 533; *Owens v. S.C. Dep't of Corrs.*, No. 09-278, 2009 WL 4807005, at * 8–9 (D.S.C. Dec. 8, 2009).

11

required to conduct shakedowns for weapons or handcuff keys made from batteries or radios and would be required to secure compliance from prisoners to remove and confiscate magazines and newspapers used to cover cell door openings and cell lights. [*Id.*]  McCall stated SMU prisoners have typically displayed a propensity to disobey institutional rules, and there is a substantial likelihood that prisoners would not comply with officers' and supervisors' requests such that some level of force and resources would have to be utilized to secure compliance.  [*Id.*]  McCall further averred that the presence of weapons and other security issues that accompany accommodation of radios, batteries, newspapers, and magazines would constitute a threat to officers and other employees in the area, as well as other prisoners.  [*Id.*]

### *Availability of Ready Alternatives to the Regulation*

Finally, McCall stated that there were and are no available alternatives for dealing with the security issues other than the removal of the items used by prisoners to create the security issues—radios, batteries, newspapers, and magazines.  [*Id.* ¶ 5.]  Plaintiff argues that prisoners can use other paper to cover cell door openings and cell lights.  [Doc. 85-1 at 4.]  However, the removal of all paper would raise issues concerning access to the courts, and McCall has not stated that there was an issue of prisoners covering cell door openings and cell lights with other papers.  [*See* Doc. 85-7 ¶ 6 (stating in a response to an interrogatory by Plaintiff that while SMU prisoners can cover their cell door openings and lights with other papers, it has occurred much less often since newspapers and magazines were restricted).]  Moreover, Plaintiff has not presented any reasonable alternative to the regulation.  *Roberson v. S.C. Dep't of Corr.*, No. 09-1333, 2010 WL 679070, at *10 (D.S.C.

Feb. 24, 2010) ("[I]n assessing whether the presence of ready alternatives undermines the reasonableness of the policy, *Turner* does not impose a least restrictive alternative test. The issue is whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal. The Supreme Court described this as a 'high standard' to meet." (quoting *Overton*, 539 U.S. at 136)). Therefore, the Court finds there is no readily available alternative to the PCI regulations at issue.

Additionally, courts have routinely upheld similar prison regulations. For example, in *Beard*, the Supreme Court upheld a policy that banned all access to newspapers, magazines, and photos. 548 U.S. at 533. Further, judges in this District who have examined the constitutionality of the SCDC ban on SMU prisoners' possession of newspapers have repeatedly concluded that this restriction does not violate prisoners' constitutional rights. *See, e.g.*, *Owens v. S.C. Dep't of Corrs.*, No. 09-278, 2009 WL 4807005, at * 8–9 (D.S.C. Dec. 8, 2009) (stating the defendants should be granted summary judgment on the plaintiff's First Amendment claim because in prior cases, the SCDC policy had been held to be rationally related to legitimate and neutral governmental objectives); *Peoples v. Burtt*, No. 07-2702, 2008 WL 2315865, at *6 (D.S.C. May 30, 2008) (holding SCDC Policy No. OP-22.12 was rationally related to legitimate and neutral governmental objectives); *Koon v. Ozmint*, No. 06-2000, 2007 WL 1486067, at *4 (D.S.C. May 18, 2007) (same); *Corey v. Reich*, No. 02-2801, 2004 WL 3090234, at *8 (D.S.C. Mar. 9, 2004) (holding the plaintiff's claims as to restrictions on his ability to receive magazines, books, or other materials was without merit); *see also Bryan v. S.C. Dep't of Corr.*, No. 07-

21, 2009 WL 512158, at *5 (D.S.C. Feb. 27, 2009) (stating the plaintiff's claim that a denial of books and legal materials violated his constitutional rights failed because the plaintiff failed to allege a specific injury resulting from the denial); *Wiles v. Ozmint*, No. 05-2111, 2006 WL 2260136, at *10 (D.S.C. Aug. 7, 2006) ("With respect to [the p]laintiff's complaints about the receipt of publications through the mail and general restrictions on visitation privileges, the [d]efendants' evidence reflects the motivations and rationale behind these policies, and . . . these specific policies have already been upheld by the courts of this District and Circuit."). The Court concludes that the restriction on the possession of radios, batteries, newspapers, and magazines satisfies the standard articulated in *Turner*, and consequently, summary judgment should be granted in favor of Defendants as to Plaintiff's claim that the restriction of these materials violates his First Amendment rights.

**Establishment Clause Claim**

Plaintiff alleges the newsletters provided by Cooper violated the Establishment Clause of the First Amendment because the main purpose of the newsletters was to advance Christianity, and the newsletters made Plaintiff a forced participant in the "Perry Christian Community" because the newsletters were Plaintiff's only access to news. The Court disagrees.

The Establishment Clause of the First Amendment "prohibits state action with a sectarian legislative purpose or with the primary effect of advancing religion, including fostering an 'excessive government entanglement' with religion." *Mueller v. Jabe*, No. 10-239, 2011 WL 1044053, at *5 (W.D. Va. Mar. 18, 2011) (quoting *Lemon v. Kurtzman*, 403

14

U.S. 602, 613 (1971)).  To avoid violating the Establishment Clause, a government regulation must meet three requirements: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" *Lemon*, 403 U.S. at 612–13 (citing *Bd. of Educ. v. Allen*, 392 U.S. 236, 243 (1968); quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)).

Here, Plaintiff acknowledges the newsletter from Cooper's office has a secular purpose and satisfies the first requirement of *Lemon*.[6]  [Doc. 52 ¶ 7(e); Doc. 52-1 at 6.]  As to the second requirement, a court must analyze "whether a particular display, with religious content, would cause a reasonable observer to fairly understand it in its particular setting as impermissibly advancing or endorsing religion."  *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 271 (4th Cir. 2005); *see Cnty. of Allegheny v. Am. Civil Liberties Union*, 492 US 573, 595–600 (1989).  The Court finds a reasonable observer would fairly understand that, contrary to Plaintiff's assertions [Doc. 52 ¶ 7; Doc. 52-1 at 6] and in its particular setting, the chaplain's office's newsletter does not impermissibly advance or endorse religion.  Cooper averred that beginning in November 2009, his office prepared a newsletter to be delivered to SMU prisoners to provide news of current events.

---

[6] The Court finds that Plaintiff appears to question whether Defendants produced the newsletter from the chaplain's office with a sincere secular purpose.  [Doc. 52-1 at 6.]  However, the Court finds Plaintiff's arguments go to the second prong of the *Lemon* test.  Plaintiff relies on *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), to argue the newsletter endorses religion.  [Doc. 52-1 at 6.]  But, as the Supreme Court explained in *County of Allegheny*, whether a government act endorses religion is a question of what viewers understand to be the purpose of the government act, when the act is viewed in its context.  492 U.S. at 595 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring)).  This endorsement analysis is the same as the analysis under the second prong of *Lemon*.  *See Lemon*, 403 U.S. at 612 (citing *Bd. of Educ.*, 392 U.S. at 243); *Lambeth*, 407 F.3d at 271.  Therefore, the Court finds, as Plaintiff acknowledges, the newsletter had a secular purpose—to provide news—and any further inquiry invokes other prongs of the relevant test, which Plaintiff acknowledges when he addresses the second prong of the *Lemon* test [*see* Doc. 52-1 at 6–7].

[Doc. 65-2 ¶ 2.]  Prisoners prepared the newsletter, which was funded by outside donations.  [*Id.* ¶ 3.]  Even though the newsletter was prepared by prisoners who practice Christianity, the purpose of the newsletter was to provide information, not to convert other prisoners.  [*Id.* ¶ 4.]  Further, no prisoner was required to receive the newsletter or any other information from the chaplain's office.  [*Id.*]  As a result, the Court finds a reasonable observer would understand the newsletter was not a government act with the primary effect of advancing or inhibiting religion.

As to the third *Lemon* requirement, "[i]n order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited [sic], the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority."  *Lemon*, 403 U.S. at 615.  The Court finds the newsletter does not foster an excessive government entanglement with religion.  The newsletter was not produced with government funds.  [*See id.* ¶ 3.]  As previously stated, the purpose of the newsletter was to provide information rather than convert prisoners to a particular religion, and prisoners were not required to receive the newsletter.  [*Id.* ¶ 4.]  Moreover, Snyder produced another source of news for SMU prisoners, the "Perry SMU Information & Awareness," which she began to distribute in February 2010.[7]  [Doc. 65-5 ¶ 4.]  Because Plaintiff has failed to

---

[7] Plaintiff also argues he was forced to depend on the "Perry Christian Community" to receive news. [Doc. 1 ¶ ; Doc. 52-1 at 8.] However, Defendants have submitted a statement that another news source was available [Doc. 65-5], which Plaintiff acknowledges [Doc. 1 ¶ 35] but seems to take issue with how often he received this publication [*see id.* ¶ 16]. The Court finds Plaintiff has failed to demonstrate that deprivation of news violates his constitutional rights. Accordingly, to the extent Plaintiff argues his Establishment Clause rights were violated by being forced to glean news from a Christian-based publication, Plaintiff has failed to demonstrate a constitutional violation the Court may remedy.

demonstrate that the newsletter violates the *Lemon* test, Plaintiff has failed to establish a violation of his rights under the Establishment Clause.

**Conditions of Confinement Claim**

Plaintiff alleges SMU prisoners were sent only fiction or biographies from the library and could not receive any rehabilitative or educational material, and the only religious material SMU prisoners could receive was the Bible, which the chaplain provided. Plaintiff claims this restricted access to library materials was an unconstitutional condition of confinement, violating his Eighth Amendment right to be free from cruel and unusual punishment. The Court disagrees.

The Eighth Amendment protection against cruel and unusual punishment includes protection against inhumane conditions of imprisonment. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). To determine whether prison officials have violated a prisoner's Eighth Amendment rights, a court must analyze "whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Id.*; *see also Wilson v. Seiter*, 501 U.S. 294, 298 (discussing Supreme Court decisions in Eighth Amendment cases and noting Eighth Amendment claims consist of objective and subjective components). "What must be established with regard to each component 'varies according to the nature of the alleged constitutional violation.'" *Williams*, 77 F.3d at 761 (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)).

To establish the subjective component of a conditions-of-confinement claim, a prisoner must demonstrate that prison officials acted with deliberate indifference—that is,

17

the prisoner must show the officials acted with more than mere negligence but less than malice. *Id.*; *see also Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (stating that "deliberate indifference entails something more than mere negligence" but "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). The prisoner must show the officials were "aware of [the] facts from which the inference could be drawn that a substantial risk of serious harm exists," and the officials drew the inference. *Farmer*, 511 U.S. at 837. For the objective component of a conditions-of-confinement claim, the prisoner must demonstrate an extreme deprivation of his rights. *Williams*, 77 F.3d at 761 (citing *Hudson*, 503 U.S. at 8–9).

Plaintiff failed to establish the subjective or objective components of his Eighth Amendment claim. Bratton, PCI's education coordinator, stated in her affidavit that dictionaries and other reference materials are kept in a reference section in the library, and no prisoners are allowed to check out these materials. [Doc. 65-1 ¶ 2.] Bratton further averred that due to budget constraints, there are no additional GED books to send to SMU, and the limited supply of GED books is only used in the classroom. [*Id.* ¶ 3.] Also, SMU prisoners are not allowed hard cover books, but there are no restrictions on the content of books SMU prisoners may check out. [*Id.* ¶ 4.] Moreover, Bratton indicated that she explained these issues to Plaintiff through responses to Plaintiff's Request to Staff forms in November and December 2009, February 2010, and March 2010. [*Id.* ¶¶ 5–8.] Finally, Bratton averred that SMU prisoners destroyed 100 of the 150 books sent to SMU in the summer of 2010, and additional books were ordered to be rotated between SMU dorms. [*Id.* ¶ 10.]

18

The Court finds that based on Plaintiff's and Defendants' allegations, to the extent Plaintiff has a right to library materials, Plaintiff has failed to demonstrate an extreme deprivation of that right or that Defendants acted with deliberate indifference in depriving Plaintiff of that right.  Plaintiff has been provided with access to books from the library and can check out all books except hard cover books, reference books, or books utilized in the classroom.  Further, Plaintiff has failed to demonstrate Defendants were aware of a substantial risk of serious harm to Plaintiff through Plaintiff's restricted access to library materials.  Therefore, the Court finds Plaintiff has failed to show a violation of his Eighth Amendment rights.

**Equal Protection Claim**

Plaintiff alleges SMU prisoners' restricted access to library materials also violated his Fourteenth Amendment right to equal protection of the laws because general population prisoners had full access to library materials.  Plaintiff further alleges PCI SMU prisoners' restricted access to dictionaries, encyclopedias, reading material, magazines, newspapers, and radios violated his Fourteenth Amendment rights because SMU prisoners at other SCDC institutions had access to these items.  The Court disagrees.

The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person equal protection of the laws.  U.S. Const. amend. XIV, § 1.  In the Fourth Circuit, a prisoner must demonstrate two elements to establish an equal protection claim:

> To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.  Once this showing is made, the court proceeds

19

> to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.

*Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Moreover, prison regulations are valid if they are reasonably related to legitimate penological interests. *Id.* at 654–55 (quoting *Turner*, 482 U.S. at 89) (explaining that prison policies are evaluated under the rational basis test rather than strict scrutiny even if the policies implicate prisoners' fundamental rights).

Here, Plaintiff has failed to establish the first element—that he was treated differently from similarly situated prisoners as a result of intentional or purposeful discrimination. In Plaintiff's case, the Court finds the "others with whom [Plaintiff] is similarly situated" were PCI's SMU prisoners, and Plaintiff admits that he was treated the same as other PCI SMU prisoners [*see* Doc. 1 ¶ 37]. Further, even if Plaintiff has a valid claim that the similarly situated group is PCI prisoners and PCI SMU prisoners were treated differently from PCI general population prisoners—or that the similarly situated group is SCDC SMU prisoners and PCI SMU prisoners were treated differently from other SCDC SMU prisoners—the Court finds Plaintiff has failed to show that any unequal treatment was the result of intentional or purposeful discrimination. As stated above, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547 (citation omitted). Consequently, the Court cannot find that the policies restricting SMU prisoners' receipt of hardcover books and ability to visit the prison library are the result of intentional or purposeful discrimination toward SMU prisoners. Rather, the Court finds these policies

are the result of reasonable determinations made by responsible, experienced prison administrators to preserve the security of the facility.   *See Block*, 468 U.S. at 589. Therefore, the Court concludes Plaintiff has failed to demonstrate a violation of the Equal Protection Clause.

**Gross Negligence Claim**

Plaintiff contends Defendants were grossly negligent through their actions.   The Court disagrees.

First, gross negligence is not actionable under § 1983.  *See Daniels v. Williams*, 474 U.S. 327, 328–36 (1986); *Davidson v. Cannon*, 474 U.S. 344, 345–48 (1986); *Pink v. Lester*, 52 F.3d 73 (4th Cir. 1995); *Ruefly v. Landon*, 825 F.2d 792, 793–94 (4th Cir. 1987). Negligence is a cause of action under state law, and § 1983 does not impose liability for violations of duties of care arising under state law.  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200–03 (1989).

Second, to the extent Plaintiff alleges a state law cause of action pursuant to the South Carolina Tort Claims Act ("SCTCA"), the Court would have jurisdiction over the claim because it is part of the same case or controversy, arising from a common nucleus of operative fact as Plaintiff's § 1983 claims.  28 U.S.C. § 1367(a); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  The SCTCA provides that a governmental entity is liable for loss resulting from the supervision, protection, control, confinement, or custody of a prisoner if conducted in a grossly negligent manner.  S.C. Code Ann. § 15-78-60(25). "Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do"; thus, gross

21

negligence is the failure to exercise slight care. *Etheredge v. Richland Sch. Dist. One*, 534 S.E.2d 275, 277 (S.C. 2000) (citing *Clyburn v. Sumter Cnty. Dist. Seventeen*, 451 S.E.2d 885 (S.C. 1994); *Richardson v. Hambright*, 374 S.E.2d 296 (S.C. 1988)). Alternatively, gross negligence has been defined as the absence of care that is necessary under the circumstances. *Id.* (citing *Hollins v. Richland Cnty. Sch. Dist. One*, 427 S.E.2d 654 (S.C. 1993)).

The Court has considered Plaintiff's and Defendants' allegations and finds there is no genuine issue of material fact as to whether Defendants failed to exercise slight care. As discussed above, Defendants have shown the restriction on materials SMU prisoners can possess is reasonably related to legitimate penological interests. Further, Defendants have shown that they have made efforts to provide alternative sources of news. Therefore, the Court cannot find that Defendants were grossly negligent by restricting SMU prisoners' access to certain materials.

**Qualified Immunity**

Defendants argue they are entitled to qualified immunity because their conduct did not violate any clearly-established rights of which a reasonable government official would have known. The Court agrees.

Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, qualified immunity is lost if an official violates a constitutional or statutory right of a plaintiff that was clearly established at the time of the

22

alleged violation such that an objectively reasonable official in the official's position would have known of the right. *Id.*

A court "'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Id.* If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998). As discussed above, Plaintiff's allegations fail to demonstrate that Defendants violated Plaintiff's constitutional rights. Therefore, Defendants are entitled to qualified immunity.

## RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that Plaintiff's motion for partial summary judgment be DENIED and Defendants' cross-motion for summary judgment be GRANTED.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

June 29, 2011
Greenville, South Carolina

23